KORNEC, RESPONDENT, *v.* MIKE HORSE MINING & MILL-
ING CO., ET AL., APPELLANTS.

No. 8657

Submitted January 20, 1947. Decided April 15, 1947.

180 Pac. (2d) 252

2

Mr. Wellington D. Rankin and Mr. Arthur P. Acher, both of Helena, for appellants. Mr. Rankin and Mr. Acher argued the cause orally.

Mr. Floyd O. Small, Mr. Ralph J. Anderson and Mr. Albert C. Angstman, all of Helena, for respondents. Mr. Small and Mr. Anderson argued the cause orally.

MR. JUSTICE METCALF delivered the opinion of the Court.

This is an action to recover damages for injuries sustained as a result of an alleged assault and battery. Plaintiff and respondent, Sam Kornec, alleged that on March 30, 1943, while he was in and upon his own mining claims and near the bound-

4

ary line between his property and that of defendant Mike Horse Mining and Milling Company, the defendant Lee Marty, a servant, agent and employee of the Mike Horse Mining and Milling Company, "acting in the course of his employment" and without cause or provocation, committed an assault and battery upon plaintiff. The jury found in favor of the plaintiff and awarded compensatory damages in the sum of $5,000. From this judgment the defendants appeal.

At all stages counsel for the defendant Mike Horse Mining and Milling Company have earnestly contended that the action of Marty in assaulting the plaintiff was a personal and independent act and not binding upon his employer. A general demurrer was interposed and error is assigned for the trial court's action in over-ruling the demurrer. It is insisted that allegations in the complaint that the acts were committed "maliciously and wantonly" by Marty, who was employed as a miner and general laborer, presumptively show an independent tort for which the employer was not liable. The complaint also states that Marty was acting in the "course of his employment" and "for and on behalf of and in the employ and pay of" and "under the direction and instructions of said defendant company and its managing agents." The contention is that such allegation is a legal conclusion and in the absence of ultimate facts pleaded from which course of employment can be inferred, is insufficient to show legal liability on the part of defendant company. Authorities may be found in some jurisdictions to support appellants' contentions (39 C. J. 1353, sec. 1577). However, the more liberal rule and the one that better conforms without modern ideas of pleading is found in Kuhl v. United States Health & Accident Ins. Co., 112 Minn. 197, 127 N. W. 628. "The terms 'scope of employment' and 'course of employment' are now generally regarded as conclusions of fact, * * *." Under current liberal rules of pleading, a complaint containing such allegations is sufficient to justify the admission of evidence in support thereof.

In May v. Farrell, 94 Cal. App. 703, 271 Pac. 789, 792, the

court cited Kuhl v. United States Health and Accident Ins. Co., supra, with approval and gave as one of the reasons for the rule the statement from Hains v. Parkersburg, M. & I, Railway Co., 71 W. Va. 453, 76 S. E. 843, 844. "To require a specification * * * of * * * the particular duties with which" the servant "is charged, would impose upon the plaintiff more than is necessary for the accomplishment of the office and purpose of the" complaint—a duty to allege matter lying peculiarly within the knowledge of the defendant and often beyond that of the plaintiff."

Other cases supporting this view are Corey v. Beck, 58 Idaho 281, 72 Pac. (2d) 856, and cases cited therein 58 Idaho 281, 72 Pac. (2d) at page 859; Brown v. Union Bus Co., 61 Ga. App. 496, 6 S. E. (2d) 388; Southern Grocery Stores, Inc. v. Herring, 63 Ga. App. 267, 11 S. E. (2d) 57; and see Bancroft Ten Year Supp., Vol 2, p. 878.

Under the better rule the allegation that the employee Marty ██ was "acting in the course of his employment" was a conclusion of fact good against a general demurrer.

At the conclusion of the plaintiff's case, counsel for defendants moved for a nonsuit upon the ground that the plaintiff had failed to prove that the defendant Marty was acting within the scope of his employment in the commission of the assault. This motion was overruled. A motion for a directed verdict on the same ground was made and denied at the conclusion of the evidence.

The record reveals that Kornec moved with his family to his present home on Beartrap Creek in 1940. His was the last house in Beartrap Gulch. The Mike Horse Mine was downstream on Beartrap Creek. In addition to his mining, Kornec maintained some livestock and had a barn and corral located about 20 feet from Beartrap Creek. In 1941, Kornec worked for the Mike Horse Mine for five months. He also worked about five months in 1942. On December 9, 1942, the manager of the Mike Horse Mine asked for permission to build a diversion dam on Kornec's property. Kornec indicated that he would

grant permission if the Mike Horse would let him use a compressor. When permission to use the compressor was denied he refused to permit the Mike Horse Mining and Milling Company to lay pipes or construct a dam on his ground. That night Kornec was discharged from his employment with the Mike Horse Mine. On December 10, 1942, Kornec, the manager of the Mike Horse Mine, and the sheriff of Lewis and Clark county went over the ground, located the corners of Kornec's claim and "agreed on the line." About December 17, 1942, the dam was constructed and the defendant company started using the water from Beartrap Creek for the camp. The evidence is in conflict as to whether the dam was built "right against the line" so that the water backed up and flooded Kornec's property or whether the dam was built 50 or 60 feet below the line. At the time the dam was built there was some discussion as to what would happen when high water flooded the road and witnesses for the defendants testified to threats made by Kornec while the dam was under construction.

The record shows that Kornec had had other difficulties with the officials and employees of the Mike Horse Mining and Milling Company. In September of 1942 an employee had blocked the road while laying pipe and Kornec was unable to pass. On another occasion the president of the company was stopped by Kornec and discussion as to the ownership of some property alleged to have been taken by a Mike Horse employee was had. The matter was settled when the president gave Kornec a check for the value of the property.

Immediately prior to March 30, 1942, Kornec complained that his children coming home from the Mike Horse school were wet to the waist from water that had overflowed the dam and flooded the road.

On March 29, 1943, the water supply at the Mike Horse camp failed and employees of the mine discovered that some boards in the spillway had washed away or had been removed. Temporary repairs were made on that day and while the repairs were being made Kornec appeared and protested about the

work being done on the dam. The following day, March 30th the defendant Marty with his carpenter's helper and another laborer came up to make permanent repairs on the dam. They worked without interference during the morning and in the afternoon Kornec appeared and remonstrated with Marty and complained that if the dam were rebuilt the water would wash out his road and bridge. According to his testimony, Kornec was standing on his own ground protesting that the dam would flood his road and wash out the bridge when Marty threatened him with a shovel and attacked him. Kornec retreated through the snow, Marty caught up and beat Kornec over the head and about the shoulders with the shovel. Kornec called to the two assistants to stop the fight but they did nothing and all the while Kornec continued to protest that Marty was on his ground. He further testified that Marty said "I don't care whose ground—boss told me to kill you." The fight continued until Kornec was back to his truck—and Kornec then returned to his home.

The defendants tell a completely different story, their version being that Marty, at the time of the affray, was working on the dam and Kornec appeared, called him names and attacked him. Marty only used such force as was necessary to defend himself. Marty and Kornec clinched and rolled down the dam onto a pile of poles. 'It is defendants' contention that Kornec's injuries, if any, were received when they both crashed into the poles. Marty states that he acted only in self defense and that he used no more force than was necessary. This conflict of evidence was, of course, for the jury to resolve and they have decided the issues in favor of the plaintiff.

It is well settled that a master is liable for the torts of his servant if committed within the scope of his employment. (Secs. 7965, 7966, Rev. Codes of 1935; Keller v. Safeway Stores, Inc., 111 Mont. 28, 108 Pac. (2d) 605, and cases cited therein.) Willful and malicious acts of the servant are imputable to the master under the same rule. (6 Labatt's Master & Servant,

8

2nd Ed., p. 6740 et seq.; Grorud v. Lossl, 48 Mont. 274, 136 Pac. 1069; Keller v. Safeway Stores, supra; 35 Am. Jur. 1006.)

Liability of the master is based on the principle of respondeat ▓ superior, that when the servant acts it is as if the master were acting. Various phrases have been used to qualify this concept. The servant or agent must have been acting in the "course of his employment," in "furtherance of his employer's interest," or "for the benefit of his master," "in the scope of his employment," etc. But a servant who acts entirely for his own benefit is generally held to be outside the scope of his employment and the master is relieved of liability. Harrington v. H. D Lee Mercantile Co., 97 Mont. 40, 33 Pac. (2d) 553. While the courts are agreed in their statement of the general rules applicable, their application of these rules has brought about a confusion that has been said to be greater than in any other branch of jurisprudence. Wigmore, 3 Anglo-American Legal Essays, 474; Penas v. Chicago, Milwaukee & St. Paul Ry. Co., 112 Minn. 203, 127 N. W. 926, 30 L. R. A., N. S., 627, 140 Am. St. Rep. 470.

Conduct regarded as within the scope of employment is described in Keller v. Safeway Stores, supra, where the court quoted from Vol. 1 Restatement of the Law of Agency: "And according to the Restatement of the Law of Agency, section 229; '(1) To be within the scope of the employment, conduct must be' of the same general nature as that authorized, or incidental to the conduct authorized. (2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered: (a) whether or not the act is one commonly done by such servants; (b) the time, place and purpose of the act; (f) whether or not the master has reason to expect that such an act will be done; and (i) the extent of departure from the normal method of accomplishing an authorized result.' " (111 Mont. at page 36, 108 Pac. (2d) at page 610.)

The employer has been held responsible where an employee

repairing a street assaulted the lessee of a street railroad who was attempting to remove stone and gravel obstructing said cars (Barree v. City of Cape Girardeau, 197 Mo. 382, 95 S. W. 330, 6 L. R. A., N. S., 1090, 114 Am. St. Rep. 763) and where a laborer sent to build a snow fence on land outside the right of way assaulted an employee of the land owner who attempted to stop the work. Waaler v. Great Northern Ry. Co., 22 S. D. 256, 117 N. W. 140, 18 L. R. A., N. S., 297.

The responsibility of the master is not restricted by the in- structions given to the servant. The restatement says: "An act, although forbidden or done in a forbidden manner, may be within the scope of employment." (Restatement of the Law of Agency, sec. 230; Keller v. Safeway Stores, supra.) And "It is not the illegal, malicious, unauthorized, or negligent act of the servant which is required to be within the scope of employment, or the authority of the servant, or in the further- ance of the master's business, because, under the rule above an- nounced the master is liable for any such act of the servant which, if isolated, would not be imputable to the master, but which is so connected with and immediately grows out of an- other act of the servant imputable to the master, that both acts are treated as one indivisible tort, which, for the purposes of the master's liability, takes its color and quality from the earlier act." Gulf, C. & S. F. R. Co. v. Cobb, Tex. Civ. App., 45 S. W. (2d) 323, 325, 326. Language quoted approved in Hiroshima v. Pacific Gas & Electric Co., 18 Cal. App. (2d) 24, 63 Pac. (2d) 340; Son v. Hartford Ice Cream Co., 102 Conn. 696, 129 A. 778; Central Motor Co. v. Gallo. Tex. Civ. App., 94 S. W. (2d) 821.

When a servant in carrying out his assigned duties makes an assault on a third party as a result of a quarrel which arose as a consequence of his performance of the task imposed and at the time and place of performance of the duties he was employed to do, then the master is liable.

The test of the defendant company's liability is not whether the assault was committed in accordance with the master's in-

structions but whether the act complained of arose out of and was committed in prosecution of the task the servant was performing for his master.

The Restatement further qualifies the rule by requiring that the employment must be such as is likely to bring the servant into conflict with others. (Restatement of the Law of Agency, sec. 245.) In Comment (a) on page 548 of the Agency Restatement, the authors state, "To create liability for a battery by a servant upon a third person, the employment must be one which is likely to bring a servant into conflict with others."

In the case at bar there was a controversy of long standing between the plaintiff and the Mike Horse Mining and Milling Company. There was evidence that Kornec had recently protested that the dam was flooding the road and causing his children to wade through water on the way to and from school. Kornec had threatened workers at the dam on a previous occasion. Marty himself testified that he knew of several instances of trouble between employers of the Mike Horse Company and the defendant. He said, "I was told that he [Kornec] had made the statement that if they sent any men up there to repair this dam or divert this water, that he and the old lady had some guns and would shoot the guts out of them." The existence of the controversy was well known to the officials of the defendant company. They might reasonably have apprehended that defendant Marty might become involved in an altercation with the plaintiff when they dispatched Marty to repair the dam. This being the case the employment was one that was likely to bring Marty into contact with Kornec.

The question of whether a servant was acting within the scope of his employment is ordinarily one for the jury. (Keller v. Safeway Stores, supra; Hoffman v. Roehl, 61 Mont. 290, 203 Pac. 349, 20 A. L. R. 189; 6 Labatt on Master & Servant, 2nd Ed., 7086; 2 Mechem on Agency, sec. 1982; 35 Am. Jur. 1040.)

Marty was in charge of the men making the repairs. There was evidence that he was carrying out the duties for which he

was employed at the time and place assigned. Certainly the quarrel began while Marty was transacting the business of the Mike Horse Mining and Milling Company and there is no evidence in the record that Marty held any personal grudge or ill will against the plaintiff. The question as to whether he was acting within the scope of his employment was a question for the jury under proper instruction. Under the facts disclosed there was evidence presented from which a jury could find that the act complained of was within the scope of the actor's employment and done while engaged in his masters' business and "in furtherance of that business and the masters' interest."

The motions for nonsuit and directed verdict were properly overruled.

But the defendants argue that the jury was erroneously instructed. Objection is directed at that portion of instruction No. 5 in which the court said: "You are instructed that acts of an employee in furtherance of the business of his employer are within the scope of his employment * * *." Defendants protest that an act might be in furtherance of the business of the employer and still not within the scope of employment. Instruction No. 5 is merely a rephrasing of the rule laid down in Grorud v. Lossl, supra, and in Kirk v. Montana Transfer Co., 56 Mont. 292, 298, 184 Pac. 987, and approved in Keller v. Safeway Stores, supra.

Defendants further objected to language in instructions 6 and 9 which imposed liability for an act committed within the apparent scope of authority. In Grorud v. Lossl, supra, 48 Mont. at page 280, 136 Pac. at page 1071, the court said: "By the great weight of authority it is also the rule that when an agent of a corporation in the course of the discharge of duties intrusted to him by it, and within the apparent scope of his authority, does an act from which a third person suffers injury, the corporation also is liable for the damages flowing therefrom, even though the agent may have failed in his duty to the principal, or may have disobeyed his instructions." (Approved in

12

Keller v. Safeway Stores and Kirk v. Montana Transfer Co., supra.)

Taking the instructions as a whole we find the jury was told to distinguish between acts done in furtherance of the business of the employer and acts committed for the employee's own purpose; that defendant Marty was a servant of the defendant corporation and if in the course of his employment he committed the acts complained of, the defendant corporation was liable even though he failed in his duty to his employer, disobeyed his instructions and acted maliciously; that if the alleged assault was prompted by malice the plaintiff was entitled to exemplary damages and if the assault was committed while Marty was acting within the scope of his employment such malice was imputable to the defendant corporation not only for actual but exemplary damages (the jury awarded only actual damages); that unless they found from a preponderance of the evidence that Marty was acting within the scope of his employment at the time the assault was committed, the defendant corporation could not be held responsible and that if Marty were found to be acting for a purpose of his own, then a verdict in favor of the defendant Mike Horse Mining and Milling Company must be returned. Reading all these instructions together it is our conclusion that the jury was correctly instructed.

Defendants object that their proposed instruction No. 16 was was not given. This instruction is taken from Keller v. Safeway Stores, supra, and is a condensation of the rule laid down in the Restatement of the Law of Agency. It is a correct statment of the law but the same matters were covered by other instructions given by the court. There is no error in refusing to give a particular instruction when the trial court has included the same subject matter in other instructions. Palmer v. Riek, 108 Mont. 108, 88 Pac. (2d) 16; Bogovich v. Scandrett, Mont. 158 Pac. (2d) 637.

The next contention is that the court erred in permitting Mrs. Kornec to testify that after the assault she called at

the mine office and attempted to arrange to have the plaintiff taken to the doctor. The mine foreman said "I don't know what I can do about it." This was denied by the foreman and his bookkeeper who was present at the time the alleged conversation took place. It is objected that this evidence of subsequent conduct was not admissible. However the rule is that when it is material to show the existence of malice or ill will, prior occurrences and both prior and subsequent declarations, acts and conduct may be shown. (4 Am. Jur. 198.)

Defendants next assign as error that the evidence of the good reputation of defendant Marty for peace and quiet was not admitted. We find no merit in that contention.

An exhaustive anotation on this point can be found in 154 A. L. R. 122 where the general rule is that evidence of the defendant's character or reputation for peace and quietude or turbulence and quarrelsomeness is inadmissible in an action for assault. Cases from 21 separate jurisdictions are cited as authority.

The reason for the rule is given in Fahey v. Crotty, 63 Mich. 383, 29 N. W. 876, 878, 6 Am. St. Rep. 305: "The testimony of defendant's good reputation in this action was inadmissible * * *. However good his reputation may be among his neighbors as a peaceable citizen, it does not tend to prove that he did not commit the assault complained of."

In Greenwood Cafe v. Walsh, 15 Ala. App. 519, 74 So. 82, 84, the action was for assault and battery and the defendant in support of his plea of self defense offered evidence of his own reputation for peace and quiet. The court said, "We can see no better reason why testimony of the character of the defendant is admissible in a case of this kind than in any other action for damages. In all actions for damages, the defendant is charged with some wrongful conduct, either to the person or the rights of the party complaining." See also 1 Wigmore on Evidence, 3d Ed., secs. 52 and 64.

The remaining specifications of error are directed at alleged errors in instructions relative to the damages. The defendants

14

sought to have the consideration of damages for alleged injuries to the plaintiff's vision and hearing withdrawn from consideration of the jury and error is predicated for the trial court's failure to so instruct the jury. There was no allegation in the complaint as to permanent injuries to the plaintiff's sight or hearing. The plaintiff alleged that "by reason of the assault upon him and as a direct and proximate result thereof" he received "grievous wounds and injuries"; that he "received and suffered painful cuts, wounds and bruises upon and about his head, face and body" and "sustained severe cuts near his right eye, on his nose and upon his forehead and a severe blow upon his chest resulting in painful bruises and injuries to and on his chest." Further, that he "received a severe blow upon his head and upon his nose and as a result suffered and still suffers severe headaches and pains in his head and nose and frequent and prolonged bleeding of his nose." The complaint then alleges that the plaintiff suffered and will continue to suffer pain and that he suffered "sustained and severe nervous shock." The plaintiff concludes his recital of damages by stating that he believes he will continue to suffer pain and nervous shock and that his health has been permanently impaired.

Motion was interposed by the defendants in which they sought an order requiring the plaintiff to make the complaint more definite and certain, among other things, "By more particularly specifying what injuries, if any, the plaintiff sustained, other than those specifically set forth, it being alleged that the plaintiff suffered certain specified injuries, and further alleging that he sustained injuries to his chest and grievous wounds and injuries, which might permit evidence of injuries to any part of the body although not specified in said complaint." This motion was denied as to the portion quoted.

The defendant was not injured by the denial of the motion ▮▮▮ to make definite and certain. Allegations of a cut about and blows on the head and painful cuts, wounds and bruises upon and about plaintiff's head are sufficient to naturally and

logically apprise the defendants of a possible permanent injury to the eye and ear. Thompson v. Aultman & Taylor Mach. Co., 94 Kan. 453, 146 Pac. 1188; Young v. Metropolitan St. Ry. Co., 126 Mo. App. 1, 103 S. W. 135; McCarthy v. Clarke, 115 Md. 454, 81 A. 12; Grogitzki v. Detroit Ambulance Co., 186 Mich. 374, 152 N. W. 923; Southern Telegraph & Telephone Co. v. Evans, 54 Tex. Civ. App. 63, 116 S. W. 418; Field v. Northwest Steel Co., 67 'Or. 126, 135 Pac. 320; Machado v. Harm, 112 Cal. App. 748, 297 Pac. 626.

The plaintiff submitted to an examination by a physician designated by the defendants and his eye and ear were examined. There is testimony from that physician in the record relative to the alleged injury to the eye and ear and there is no showing that the defendants were surprised or misled by the pleadings; nor is there any showing that if a new trial were granted any additional evidence could be produced by the defendants.

In the course of his direct examination, Kornec testified as follows: ''Q. What about your eyes? A. My vision it is on my right eye I can't see very good now. It is just—

''Mr. Rankin: I object to the question with reference to the eye. I take it he didn't know about that until a year after.

''The Court: He said that. Mr. Rankin: Yes, I didn't know.

''The Court: I think you were engaged in conversation when he testified. If there is any doubt about it ask him about it so we will have something.

''Q. Mr. Kornec with your eyes you mention trouble with your vision from that. At the time when we filed the complaint in this action did you know definitely at that time that your vision was or was going to be impaired? A. About that time it was; since he hit me that my eye was just blue.''

If the injury to the eye and ear developed after the commencement of the action then evidence as to such injuries is admissible under section 8661, Revised Codes. ''Damages may be awarded, in a judicial proceeding, for detriment resulting after the commencement thereof, or certain to result

in the future.'' Under this section proof of damages may extend to all facts which occur and grow out of the injury after the commencement of the action and up to the date of the trial. Collins v. Sargent, 89 Cal. App. 107, 264 Pac. 776; Joerger v. Pacific Gas & Electric Co., 207 Cal. 8, 276 Pac. 1017; Berry v. Bank of Bakersfield, 177 Cal. 206, 170 Pac. 415; 8 Cal. Jur. 754; 1 Bancroft Code Pleading 284.

On cross examination the plaintiff testified that he told his attorneys that his hearing was damaged before the complaint was filed but that at that time he thought it was going to get better. The plaintiff also stated that he had advised his attorneys that his eye bothered him.

If the injuries were known at the time of the commencement of the action then evidence of impairment of vision and loss of hearing must be admitted under the general allegations of damages set forth in the complaint. Defendants rely on Gordon v. Northern Pac. Ry. Co., 39 Mont. 571, 104 Pac. 679, 18 Ann. Cas. 583, where there was a specific allegation of injury to the plaintiff's right eye. At the trial the plaintiff introduced evidence that as a result of the injury to his right eye the sight of his left eye was weakened. The court there held that impairment of the vision of the left eye was not the necessary result of an injury to the other eye and therefore admission of that evidence was error. The Gordon case was explained in McCulloch v. Horton, 105 Mont. 531, 74 Pac. (2d) 1, 4, 114 A. L. R. 823. In the McCulloch case there was a general allegation of injury in that the bones of plaintiff's left hip were fractured and splintered and this court there held that evidence that the plaintiff was suffering from arthritis in that hip was admissible under the pleading. The court said: ''We think there is a ·substantial difference between this case and the Gordon Case. In the latter, the plaintiff 'particularized the injury as the destruction of the sight of his right eye.' Had this been followed by an allegation of a general nature to the effect that, because of the injury, his vision had been impaired, then it is likely this court would have permitted evi-

dence of trouble in the other eye, as did the Supreme Court of Indiana in Emerson Brantingham Co. v. Growe, 191 Ind. 564, 133 N. E. 919. In other words, the complaint before us here does not particularize all the injuries as did that involved in the Gordon Case.''

In 105 Mont. at pages 544 and 545, 74 (2d) 1, 114 A. L. R. 823, of the McCulloch case several cases are cited and examples given of evidence of injuries admissible under general allegations analogous to the instant case.

In the instant case the injuries resulting in the damage to the eye and ear were alleged in general terms. Under these general allegations evidence of the impairment of plaintiff's vision and his loss of hearing was properly admitted.

The following instruction was given by the court as instruction No. 7: ''You are instructed that if you find from a preponderance of all the evidence in this case that plaintiff is entitled to recover actual damages, then you will determine the amount which will compensate plaintiff for all of the detriment proximately caused as a result of the striking of the plaintiff by the defendant Marty, and in arriving at such amount you will give consideration to the nature and extent of the injuries suffered by the plaintiff if any, the mental and physical pain which he endured if any, his loss of earnings, if any, his medical expenses as a result of his injuries, if any, and if you further find that plaintiff was permanently injured you will also find the amount that will compensate him for the loss suffered by such permanent injuries.'' Error is assigned because under such instruction the jury was permitted to consider (1) permanent injury, and (2) loss of earnings as items of damages. The record shows that prior to the assault, plaintiff was able to do the strenuous work involved in developing his mining claim; that after the assault he was able only to do chores around the house, suffered from dizzy spells and recurrent headaches and as already discussed, suffered from impaired vision and loss of hearing. Dr. Berg testified for the plaintiff:

''Q. Let me ask you if the plaintiff here complained of

18

some injuries to his eye after those injuries and also to his left ear, might the blows have been a contributing factor? A. Any injuries of that type would be a contributing factor to disability occurring later on.''

Dr. Flinn, testifying for the defendant, found that the plaintiff was totally deaf in his left ear and that the vision in his right eye was defective but attributed the loss of vision to old age and the ear trouble to some former infection or injury. Having held that evidence of loss of vision and hearing was properly admitted there is no conflict as to the permanence of the injury. The only conflict was whether, under the medical testimony, injuries were caused by the assault. That was solely a question for the jury to decide. Kelley v. John R. Daily Co., 56 Mont. 63, 181 Pac. 326; De Sandro v. Missoula Light & Water Co., 52 Mont. 333, 157 Pac. 641.

There was no medical testimony as to the probable duration of the plaintiff's injuries, but in view of the medical testimony that the plaintiff was totally deaf and the vision of his right eye was impaired, both injuries being objective in character, no expert medical testimony as to permanence of injuries was necessary. For a collection of authorities see the annotation to Pine v. Rogers, 182 Okl. 276, 77 Pac. (2d) 542, in 115 A. L. R. 1146, 1149.

At the time the parties settled the instructions, the only objection directed at instruction No. 7 was as to permanence of the injuries. In argument and in defendants' briefs, however, it is contended that it was also error to instruct that the jury could consider loss of earnings as an element in the assessment of damages. There is evidence that the plaintiff could no longer do work necessary to the development of his mining claims. That was the work in which he was engaged at the time of the assault. Under such evidence, plaintiff is entitled to recover for diminution in his capacity to work. Hamilton v. Great Falls Street Ry. Co., 17 Mont. 334, 42 Pac. 860, 43 Pac. 713. In any event, since this objection was not advanced at the time for settling the instructions, it is not now

available to the defendants on appeal to this court. Brennan v. Mayo, 100 Mont. 439, at page 445, 50 Pac. (2d) 245, and cases therein cited; Pilgeram v. Haas, Mont., 167 Pac. (2d) 339, 350.

Finally, it is contended that the damages were so excessive as to shock the conscience and understanding of the court and error is assigned for the trial court's refusal to grant a new trial. Many of the items of damages already have been discussed. It is sufficient to say that in the instant case where there is evidence of permanent injury and pain and suffering and where no exemplary damages were awarded, there is an insufficient showing of passion and prejudice of the jury so as to require this court to order a new trial or arbitrarily substitute its judgment for that of the jury. Montana Horse Products Co. v. Great Northern Ry. Co., 91 Mont. 194, 7 Pac. (2d) 919; McCartan v. Park Butte Theater Co., 103 Mont. 342, 343, 62 Pac. (2d) 338; Sullivan v. City of Butte, Mont., 157 Pac. (2d) 479.

After consideration of all the questions raised by the defendants and after a careful analysis of the evidence, we are of the opinion that the record discloses no error affecting the substantial right of defendants. The judgment is affirmed.

Mr. Chief Justice Adair and Associate Justices Choate and Angstman concur.

Mr. Justice Cheadle (dissenting).

I believe that the majority opinion establishes a questionable precedent in this jurisdiction in the application of the doctrine of respondeat superior. If the factual situation presented here justifies a recovery from the employer, it is difficult to conceive of a case in which a master may not be held responsible in damages for the tortious act of the servant committed during the period of employment.

I have no quarrel with the authorities relied upon in the majority opinion, but cannot agree that they support the decision, on the facts as here disclosed.

It is my view that the motion of the defendant company for a judgment of nonsuit should have been granted; and since

the defendants supplied no defects in plaintiff's evidence by the submission of its case after the motion was overruled, that defendants' motion for a directed verdict should have been granted by the trial court.

The vital question, of course, is whether or not the acts of the defendant Marty complained of, which resulted in the alleged injuries, may be characterized as coming within the scope of Marty's employment. Considering plaintiff's testimony alone, it is my view that it may not be so characterized. Plaintiff's testimony discloses that the commencement and continuation of the alleged assault took place entirely on plaintiff's own property, and that at no time during the assault, or immediately prior thereto, was plaintiff on property owned by the defendant company. It is not claimed that the assault took place in any attempted or successful ejection of plaintiff from defendant's property, or to restrain his entry thereupon.

The rule apparently adopted by this court is found in Keller v. Safeway Stores, Inc., 111 Mont. 28, 108 Pac. (2d) 605, 610. Therein it is said: ''Beyond question it is the rule that the principal is liable for wrongs committed by the agent while acting within the scope of his employment. Fowlie v. Cruse, 52 Mont. 222, 157 Pac. 958; secs. 7965, 7966, Rev. Codes. The rule finds expression in the following language in Harrington v. H. D. Lee Mercantile Co., 97 Mont. 40, 59, 33 Pac. (2d) 553, 558: 'When the application of respondeat superior is presented, ''the decisive question in every instance is whether the agent or employee was, at the time of negligent injury, acting within the scope of his employment. If he acted independently of his employer, or was upon missions or purposes of his own, then the employer is not to be held accountable in damages.'' ' ''

In the same case this court apparently approved the rule as set forth in the Restatement of the Law of Agency, section, 229, as follows: '' '(1) To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized. (2) In determining whether or not the conduct, although not author-

ized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered: (a) Whether or not the act is one commonly done by servants; (b) the time, place and purpose of the act; (f) whether or not the master has reason to expect that such an act will be done; and (i) the extent of departure from the normal method of accomplishing an authorized result.' ''

The court further said: ''The fact that an agent in acting for his principal may deviate from express instructions or even act in utter disobedience thereof does not generally relieve the principal of liability *if the acts were in furtherance of or incidental to the employment for which the agent was expressly or impliedly engaged.*'' (Emphasis mine.) And see Klitch v. Betts, 89 N. J. L. 348, 98 A. 427; Davis v. Houghtelin, 33 Neb. 582, 50 N. W. 765, 14 L. R. A. 737; Kastrup v. Yellow Cab & Baggage Co., 129 Kan. 398, 282 Pac. 742; Brown v. Union Pac. Ry. Co., 111 Kan. 338, 207 Pac. 196; Broome v. Primrose Tapestry Mills, 59 Ga. App. 70, 200 S. E. 506; Dolan v. Hubinger, 109 Iowa 408, 80 N. W. 514; Holler v. P. Sanford Ross, 68 N. J. L. 324, 53 A. 472, 59 L. R. A. 943, 96 Am. St. Rep. 546.

Measured by this rule the employer in this instance should not be held accountable in damages for the act of the agent complained of. Such agent was employed merely as a common laborer, and the act of employment in which he was engaged immediately prior to the time of the alleged assault was the repair of a dam located on the employer's property. It has not been shown, and it is difficult to perceive, in what way the purposes of the employer were being furthered by the act of the employee in leaving his employment, departing from the employer's property, and committing an assault against the plaintiff on the latter's property. If plaintiff's testimony is to be believed, as it apparently was by the jury, he was in no way interfering with the work of the employee. It is my view that the alleged assault, under such circumstances, cannot be construed as being in furtherance of the employer's business,

or within the scope of the employment. Rather, the plaintiff's testimony discloses, if he told the truth, that the employee was at the time of the assault, engaged in a mission or an errand of his own, which was in no way connected with his employment.

Under such circumstances, the rule stated in 39 C. J. 1307, and numerous cases listed under note 15, is applicable: ''If the assault was committed by the servant, not as a means or for the purpose of performing the work he was employed to do, but in a spirit of vindictiveness or to gratify personal animosity, or to carry out an independent purpose of his own, then the master is not liable.'' A case almost precisely in point is Ward v. Erie Ry. Co., 89 N. J. L. 525, 100 A. 1029.

I appreciate the almost hopeless conflict in the cases involving application of the doctrine of respondeat superior, but I think that in view of the factual situation presented here, the majority opinion enlarges the scope of that doctrine to a dangerous and unwarranted degree.

Rehearing denied May 23, 1947.